In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1839

BERNADINE E. MATTHEWS,

*Plaintiff-Appellant,*

*v.*

WAUKESHA COUNTY, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:10-cv-00440-RTR — **Rudolph T. Randa**, *Judge.*

ARGUED JANUARY 15, 2014 — DECIDED JULY 22, 2014

Before FLAUM, EASTERBROOK, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* In January 2006, Bernadine Matthews submitted an application to Waukesha County for two open positions—Economic Support Specialist ("Specialist") and Economic Support Supervisor ("Supervisor"). She was unsuccessful in her efforts to secure either position, and filed a suit in federal court alleging that she was discriminated against on the basis of race when she was not hired, in viola-

tion of Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. Matthews dismissed her claim related to the Supervisor position, and therefore this appeal concerns only her allegations of race discrimination relating to the Specialist position. The district court granted the defendants' motion for summary judgment, and Matthews appeals that determination.

Because this is an appeal from a grant of summary judgment in favor of the defendants, we will consider the facts in the light most favorable to Matthews, resolving all evidentiary conflicts in her favor and according her the benefit of all reasonable inferences that may be drawn from the record. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7thCir. 2011). Except where indicated, the following facts are undisputed and largely are culled directly from the Plaintiff's Response to Defendants' Proposed Statement of Undisputed Facts. Those undisputed facts reveal that summary judgment was appropriate.

Included in the job description for the position of Specialist at Waukesha County is that the person must work with and evaluate specific public and economic assistance programs including FoodShare, Medical Assistance, Child Care, Child Support, and W-2. The Specialist at Waukesha County is responsible for conducting eligibility determinations as to public and economic assistance programs and working with individuals and families with minor children to evaluate, calculate and determine eligibility for such programs. The new employee would be under the supervision of Economic Support Supervisor Luann Page and therefore Page was the one responsible for coordinating the hiring process and ultimately making the decision as to whom to hire. The

position was posted and advertised by Human Resources Assistant Debbie Rapp, who was responsible for seasonal job openings and entry-level positions which included the Specialist position. Rapp engaged in the initial screening of the applications to determine if the applicants possessed the minimum qualifications of the position. The advertisement for the Specialist position affirmatively requested no resumes, but a resume was required for application for the Supervisor position.

Matthews submitted an application for the Specialist position, and submitted a resume as well because she also sought to be considered for an open Supervisor position. The cover letter and resume submitted for the Supervisor position would have been forwarded to Senior Human Resources Analyst Renee Gage and would not have been seen by Rapp, who handled only the applications for the Specialist position. Matthews also voluntarily chose to complete a separate, optional, Affirmative Action Program form, which disclosed her race as African-American. Pursuant to her duties, Rapp examined Matthews' application when it was submitted, and determined that it did not reflect the minimum qualifications. Accordingly, she wrote "No T & E," signifying that the application lacked evidence of the required training and experience, and a rejection letter was sent informing Matthews of that determination. The letter informed Matthews that she could contact Rapp if she had additional information to bring to Rapp's attention. Matthews then contacted Waukesha County and spoke with Rapp inquiring as to why she did not qualify for the Specialist position. In the course of that conversation, Matthews provided additional information and

explanation about her work experience. With the additional information, Rapp placed Matthews on "hold" and consulted with Gage, the Senior Human Resources Analyst.

The parties do not agree as to what happened next. Matthews contends that her application was never forwarded to Page for consideration, but also argues in the alternative that even if it was forwarded, the delay caused her application to be essentially disregarded. The defendants, however, assert that after Rapp consulted with Gage, it was determined that the application met the requirements and the application was forwarded to Page. Page testified in her deposition that she received a call informing her that the application was being forwarded and that she remembered receiving the application because she had already scheduled some interviews and thought that she might have to schedule another one. Moreover, Gage testified that she instructed Rapp to forward the application to Page. Matthews has submitted no evidence refuting that testimony. She asserts that Rapp informed her the position had already been filled, but even if we credit that statement for the purposes of this summary judgment motion, it does not create a material issue of fact. Matthews has identified nothing that creates a dispute as to Gage's testimony that she instructed Rapp to forward the application to Page and Page's testimony that she received the application, reviewed it, and categorized it based on the information contained in it. Moreover, Matthews acknowledges that when she called Rapp concerning her rejection, Rapp discussed with Gage whether her application met the requirements, which contradicts an understanding that the position was filled. Although Matthews is entitled to the benefit of reasonable

inferences, that does not extend to inferences that are supported only by speculation or conjecture. *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). "Thus, we have explained that the nonmoving party 'must do more than raise some metaphysical doubt as to the material facts; [she] must come forward with specific facts showing that there is a genuine issue for trial.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008), quoting *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir.2006). The district court accordingly did not err in determining that there was no dispute of fact as to the issue of whether Matthews' application was forwarded to Page.

The applications sent to Page did not include the Affirmative Action Program form, and none of those involved in the hiring process for that Specialist position had any information as to the applicant's race. It is undisputed that Page did not know the race of the applicants when she evaluated the applications, and that the interview selection process and ultimate hiring decision were based upon finding the most qualified individual for the position. Rapp did not participate in the grouping of applications, the decision as to whom to interview, or the decision as to whom to hire. Of the 42 African-American applicants (excluding Matthews), Rapp determined that 34 met the minimum qualifications and forwarded their applications to Page.

Upon receiving the applications that met the minimum training and experience requirements, Page sorted the applications into four categories based upon how extensive and recent each applicant's experience was and how relevant that experience was to the position. Category 1 included those who had

recent work experience (lasting 1-2 years in the 2 years prior to application) in determining eligibility for FoodShare, Medical Assistance, and Child Care. Category 2 encompassed those who had experience in the W2 program, Child Support, and Child Care programs. In Group 3, Page placed those who had recent experience working with clients in a county agency or a community social work setting. Finally, Group 4 was composed of those who had experience in interpreting program policy and working with the public in the role of public relations or similar experience.

Matthews' application reflected experience working 20 hours per week as a gate agent for Midwest Connect Airlines from June 2003 to the present, full-time as a commercial service representative for Wisconsin Gas Company from September 1980 until April 1999, and 20 hours per week as a pretrial services representative from August 2001 until December 2001. The duties attributed to her position at Wisconsin Gas included negotiating payment plans, assisting low income families, and verifying income. Although Matthews had experience working with the public, she did not have experience with the particular programs such as FoodShare, Medical Assistance, Child Care, W-2, or Child Support as required for Groups 1 and 2, or experience working with clients in a county agency or community social setting as reflected in Group 3. Based upon that experience, Page placed her in Group 4.

Because Group 1 had the most directly relevant experience, Page chose to interview applicants in Group 1 initially, and to proceed to interviews with Group 2 applicants only if a suitable candidate was not found in Group 1. In addition, "courtesy interviews" were provided to three internal

Waukesha County candidates without regard to their experience. A job offer was extended to Julie Vetter, who is white and who was a candidate in Group 1 and not one of the courtesy interviews. Vetter was hired based upon her approximately 7 years of recent and relevant work experience in California, first at San Joaquin County Human Services Agency and then at Calaveras Calworks and Human Service Agency, where she determined eligibility for comparable public assistance programs in California. Page therefore never proceeded to interviews for applicants in Groups 2-4.

A few months later, in April 2006, a second Specialist position became vacant. Because of the close temporal proximity to the earlier process, Waukesha County chose to use the pool of applicants from the January opening. Patricia McElroy-Komppa ("Komppa") was the Supervisor for the newly vacant position, and she received and reviewed those applications to determine interviews. In determining whom to interview, Komppa looked for individuals who had previous experience in determining eligibility for public assistance programs, and focused on experience rather than education. She interviewed some applicants from Groups 2 and 3, and ultimately hired Princella Turner, an African-American, because she believed that Turner was the most qualified for the position. Neither Matthews nor anyone else in Group 4 received an interview for that April 2006 opening.

Matthews alleges that the hiring process was discriminatory on the basis of race. The district court granted the defendants' motion for summary judgment, and Matthews appeals that determination as well as the district court's decision to strike certain evidence.

We turn initially to the challenge to the district court's decision to strike evidence. The district court below faced numerous evidentiary challenges preceding its summary judgment determination, and discussed those challenges at some length in an attempt to parse out the acceptable from the objectionable. For instance, the defendants sought to include evidence of Matthews' 24-year litigation history aimed largely at her prior employer Wisconsin Gas, including at least 4 race discrimination complaints, 7 disability/handicap discrimination complaints, 1 complaint of age discrimination, and 18 complaints based on retaliation, harassment, unfair labor practices, and other employment issues. That history included a representation in a lawsuit a year after this complaint was filed that she was on permanent medical restrictions limiting her to no more than 20 hours of work weekly stemming from a neck injury sustained in 1996. The district court refused to consider the list of lawsuits, holding that they were irrelevant under Federal Rule of Evidence 401. It rejected, however, Matthews' motion to strike the representations as to medical restrictions on her ability to work full-time, as those facts bore on Matthews' qualifications to work the full-time Specialist job.

The district court addressed in a similar manner the defendants' myriad challenges to exhibits submitted by Matthews which fell within the following categories: (1) newspaper articles; (2) EEOC filings; (3) DOJ filings; (4) applications; (5) interview notes; (6) depositions summaries; and (7) County policies. Matthews challenges on appeal only the district court's decision to exclude consideration of the newspaper clippings. Matthews asserts on appeal that the newspaper, the *County Beat*, is published by Waukesha County, and therefore is

an admission by a party opponent. Matthews then concludes that the newspaper is not therefore hearsay. This argument spans a mere three sentences. Matthews never identifies what in the newspaper she seeks to admit, nor does she provide any legal authority for the proposition that anything printed in a county newspaper should be considered an admission by the county in a subsequent lawsuit. It is not the province of the appellate court to search the record in order to discover the factual underpinnings of an argument, and we will not consider arguments that are not supported by relevant law. See *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel.") This argument is waived. *Id.*

We turn then to the merits of the summary judgment determination. Matthews argues that the district court improperly granted summary judgment to Waukesha County (the "County") on her claim under Title VII because she established a claim of race discrimination under both the direct and indirect methods. See generally *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234–35 (7th Cir. 2014) (setting forth the direct and indirect methods of establishing discrimination under Title VII). Matthews argues that the County discriminated against her in failing to hire her for the position and also in eliminating her from consideration based on her race. We will consider these theories in turn.

First, Matthews argues under the indirect method of establishing a claim that she established a prima facie case by demonstrating that: (1) she is African-American; (2) she applied for and was qualified for the position; (3) she was

rejected for that position; and (4) the employer filled that position with a person not in her protected class. We can assume for the purpose of this opinion that the prima facie burden was met, but that of course does not end the inquiry. The burden simply shifts at that point to the County to articulate a legitimate, nondiscriminatory reason for its actions, and it has done so here. *Adams v. City of Indianapolis*, 742 F.3d 720, 735 (7th Cir. 2014). The undisputed evidence in the record demonstrates that the applicants were separated into four groups based on the type of job experience they possessed, with Group 1 comprising individuals with job experience that was most directly related to the open position. Only individuals in Group 1 were interviewed, and the person hired was from that group. Therefore, the County articulated a legitimate, nondiscriminatory basis for its hiring decision.

That shifts the burden back to Matthews to present evidence that the stated reason was pretext for discrimination. *Id.* She has failed to present evidence establishing a genuine issue of fact as to pretext. Matthews does not even argue that those categories are not directly related to the job duties for the open position, or that the grouping was itself pretextual. In fact, in her response to the defendants' statement of undisputed facts Matthews acknowledged that none of those involved in the hiring process for that Specialist position—including Page—knew the race of the applicants when evaluating and grouping the applications, that the interview selection process and ultimate hiring decision were based upon finding the most qualified individual for the position, and that the four categories were based upon how extensive and recent each applicant's experience was and how relevant that experience was to

the position. Those undisputed facts dictate that the nondis-criminatory reason was not pretextual. Matthews' arguments to the contrary rely on unsupported—and at times farcical—speculation. For instance, Matthews sets forth the testimony from Page that when she saw that Matthews' application had been forwarded her first thought as she opened the envelope was that she might need to schedule another interview. Matthews then concludes "[t]his proves that Page thought Matthews should have been placed in Group 1." Appellant Brief at 25. That is not a reasonable inference from the statement. Similarly, Matthews argues that Page could tell the race of applicants based on their names and therefore out of pure racial animus Page placed Matthews in Group 4. *Id.* The "facts" identified to support that proposition do not even marginally support it. Page testified that she did not know the race of any of the applicants before grouping them, and Matthews agreed that fact was undisputed. In her deposition, Page was also asked if there are any names that she associated more with African-Americans than non-African-Americans and she merely responded: "possibly." When then asked specifically about particular names, she stated that she did not necessarily associate any of those individual names more with African-Americans. She subsequently was asked whether she would associate Princella with somebody who was African-American (Princella Turner was hired for the April 2006 position) and she again said "not necessarily," then volunteer-ing that the name "sounded southern." From that colloquy, Matthews argues that "[a] jury could conclude that 'sounding Southern' meant that Page felt Turner would fit the stereotype of the overly-accommodating African-American from the

American South. From that, a jury could conclude that she knew the race of several candidates. Her claims to be ignorant of the races of the candidates are therefore simply false." That argument is unfounded, and is emblematic of the types of inferences that Matthews repeatedly asks us to draw throughout her briefs to this court. Those flights of fancy are precisely the type of speculation and conjecture that we have repeatedly deemed insufficient to avoid summary judgment. *Singer,* 593 F.3d at 533; *Argyropoulos,* 539 F.3d at 732; *Keri*, 458 F.3d at 628. Matthews admitted as undisputed that Page did not know the race of the applicants and that is dispositive here.

She nevertheless maintains that even if that line of argument proves faulty, she can establish discrimination under the indirect method on the related theory that her application was not even considered or appropriately categorized because Rapp refused to forward her application for evaluation while forwarding that of similarly-situated white applicants. Matthews contends that under this theory, the only element of the prima facie case that is at issue is whether Matthews was ever actually considered for the position. As evidence that Matthews' application was never actually forwarded to Page, the decisionmaker in the hiring process, Matthews points to her own (disputed) testimony that Rapp informed her on the phone that the position had already been filled. Moreover, Matthews asserts that even if the application was forwarded to Page, the stigma and delay from the initial rejection prevented Matthews from being fairly considered, resulting in Page placing her in Group 4 despite Page's belief that Matthews should have been in Group 2 or 3. Those allegations are insufficient to create a genuine issue of fact. First, as we stated

earlier, even assuming that Matthews' version is correct and that Rapp informed her that the position was filled, that does not cast doubt on the relevant issue which is whether the application was forwarded. Matthews acknowledges that when she spoke with Rapp concerning her application and protested the initial rejection, Rapp consulted Gage. Gage in turn testified that she informed Rapp that the application satisfied the initial requirements and instructed her to forward it for consideration. Page testified that she received a call informing her that an additional application was being sent to her, and that she then received Matthews' application from Human Resources. She testified that she then examined that application and placed Matthews in Group 4. That uncontradicted testimony establishes that the application was forwarded. The alleged comment by Rapp to Matthews that the position was filled, which Rapp disputes, even if taken as true does not raise a reasonable inference that the application was never forwarded. The comment does not address that matter, and the testimony that is on point all indicates that the application indeed was forwarded by Page. The district court properly held that there was no genuine issue of fact as to whether the application was forwarded, and therefore Matthews failed to present a prima facie case under that theory.[1]

The second assertion by Matthews is that even if her

---

[1]  She similarly failed to establish a prima facie case of discrimination as to the April 2006 position, because Turner who was hired for that position was African-American and therefore Matthews cannot demonstrate that the employer filled the position with a person who was not a member of the protected class.

application was forwarded to Page, it nevertheless was not fairly considered because the initial rejection adversely impacted it. Matthews contends that Page was impacted by her knowledge that the application was initially deemed to lack the requisite training and experience, and that the delay in receiving the application caused Page to assign it to Group 4 without consideration. There is no factual support for this argument. The undisputed evidence was that applications were received by Page over time rather than in one batch. Page testified that when she received Matthews' application she was prepared to schedule Matthews for an interview if warranted, that she reviewed the application, and that based on the experience listed therein she assigned Matthews to Group 4. There is no evidence other than rank speculation that Page refused to consider the application or that her examination of it was adversely impacted by the timing of its submission to her. Therefore, Matthews has failed to raise a genuine issue of fact as to this claim.

Second, Matthews contends that she has established her Title VII claim of race discrimination under the direct method. Under the direct method, Matthews must provide either direct or circumstantial evidence of intentional racial discrimination. *Nichols v. Michigan City Plant Planning Dept.*, ___ F.3d ___, 2014 WL 2766776 at 7 (7th Cir. 2014); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010). The undisputed facts establish that the applicants were categorized into groups based upon the degree to which their past experience was related to the requirements of the open position, and that the person sorting applicants into those groups was unaware of the race of the applicants at the time that sorting occurred.

Applicants in the highest group were interviewed first, and the person hired was from that group. Matthews acknowledges, then, that she was placed into Group 4 based on an analysis of her experience by the hiring person who was unaware of her race or the race of the other applicants. There is no evidence whatsoever that the grouping process itself was a means of discriminating based on race, and given the undisputed fact that her race was unknown at the time, there is no evidence here of intentional racial discrimination.

Matthews' nonetheless argues that she should succeed under a "cat's paw" theory that attributes Rapp's improper motives to Page. "In the law of employment discrimination, the 'cat's paw' theory can apply when a biased subordinate who lacks decision-making power uses the formal decision-maker 'as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Smith v. Bray*, 681 F.3d 888, 897 n.3 (7th Cir. 2012), citing *EEOC v. BCI Coca-Cola Bottling Co. Of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006); *Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1192–93 (2011). Liability under that theory can be imposed where a non-decision-making employee with discriminatory animus provided factual information or input that may have affected the adverse employment action. *Smith*, 681 F.3d at 897. Here, Matthews asserts that Rapp possessed such a discriminatory animus as indicated by her false statement that the position had been filled, and also by her action in forwarding applications from white employees who lacked minimal qualifications. Matthews contends that Rapp provided input that caused Page to place Matthews in Group 4 and thus fail to consider her application. Once again, this argument lacks support in the record. Setting aside

whether there is any evidence whatsoever of discriminatory animus by Rapp, this argument fails because there are no facts indicating that Rapp provided any input to Page concerning Matthews' application, nor is there any evidence that the slight delay in forwarding the application to Page had any impact on the decision at all. There is no support for a cat's paw theory here.

Finally, Matthews argues nonetheless that statistical evidence provides evidence of intentional racial discrimination by revealing a pattern and practice of discriminating against African-Americans. There are numerous problems with this approach. As an individual rather than a class action, we have held that evidence of a pattern or practice can only be collateral to evidence of specific discrimination against the plaintiff herself, *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1252 (7thCir. 1990), and Matthews lacks such evidence. Moreover, to proceed with such a claim, Matthews would need to present evidence indicating that racial discrimination was the employer's standard operating procedure—the regular rather than unusual practice. *International Broth. Of Teamsters v. United States*, 431 U.S. 324, 336 (1977); *Adams v. Ameritech Services, Inc.*, 231 F.3d 414, 422 (7th Cir. 2000). Statistical evidence may be helpful in establishing such a claim, but those statistical comparisons must involve the proper "community" or group when making the statistical comparison. *Id.* at 423; *Hazelwood School District v. United States*, 433 U.S. 299, 308 (1977). For instance, in *Hazelwood* the Supreme Court held that a statistical comparison of the racial composition of Hazelwood's teacher work force to its student population "fundamentally misconceived the role of statistics in employment discrimination

cases." *Id.* The Court held that a proper comparison would be between the racial composition of Hazelwood's teaching staff and that of the qualified public school teacher population in the relevant labor market. *Id.* Here, the district court held that Matthews' statistical comparison was insufficient to raise a claim of disparate pattern or practice, and we agree. Matthews introduced the testimony of an expert comparing the African-American representation of all of Waukesha County's employees in 2005 to such representation among workers employed by private sector organizations in the Milwaukee-Waukesha Primary Metropolitan Statistical Area (PMSA) in 2005 in the categories or Officials, Professionals, Technicians, Protective Services, Office/Clerical, Skilled Craft and Service Maintenance. She concluded that the County employed African-Americans in numbers less than would be expected given their representation among individuals working in that geographical area. The County's expert criticized that focus, arguing that the groups compared do not accurately reflect the groups who are potential candidates for County employment based on interest and qualifications. The County's expert compared the racial composition of those who applied for the County's Specialist position between 2005 and 2010, and those hired for it, and concluded that the African-American applicants were hired in numbers consistent with their representation in the relevant applicant pool. Matthews claim is that the process of evaluating the applications resulted in different treatment, rather than that the process of recruiting applicants or accepting applications was discriminatory, and the comparison between applicants and those hired is a more narrowly-tailored focus. The district court properly concluded that the

probative value of Matthew's statistical evidence was limited because of its broad scope. See *Johnson v. Transportation Agency, Santa Clara County, Cal.*, 480 U.S. 616, 631–32 (1987) (comparison of the percentage of minorities in the employer's work force with those in the area labor market is appropriate when analyzing jobs that require no special expertise but where a job requires special training the comparison should be with those in the labor force who possess the relevant qualifications.) Moreover, as discussed above, Matthews lacks other evidence indicating discrimination in the hiring process which could bolster that statistical evidence. See *Baylie v. Fed. Reserve Bank of Chicago*, 476 F.3d 522, 524 (7th Cir. 2007) ("data showing a small increase in the probability of discrimination cannot by itself get a plaintiff over the more-likely-than-not threshold; it must be coupled with other evidence which does most of the work.") The district court properly held that summary judgment was appropriate as to the Title VII claims.

Matthews' claim against Rapp under 42 U.S.C. § 1983 is based upon the same facts as the Title VII claims, and fails for the same reasons. Accordingly, the decision of the district court is AFFIRMED.