In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-1133

GWENDOLYN D. CUNNINGHAM,

*Plaintiff-Appellant,*

*v.*

LLOYD J. AUSTIN, III, United States Secretary of Defense,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:22-cv-00165 — **Sarah Evans Barker**, *Judge.*

ARGUED NOVEMBER 5, 2024 — DECIDED JANUARY 3, 2025

Before SCUDDER, ST. EVE, and JACKSON-AKIWUMI, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Gwendolyn Cunningham, a Black woman, alleges that the Department of Defense discriminated against her when it failed to promote her into a newly created position in its civil service. She sued Lloyd Austin, III, in his official capacity as Secretary of Defense, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. The district court granted summary judgment in Austin's favor, reasoning that

the Department offered legitimate, nondiscriminatory reasons for its promotion decision and Cunningham failed to offer evidence that the Department's reasons were pretextual. We agree and therefore affirm the district court's judgment.

## I. Background

Gwendolyn Cunningham first joined the Department of Defense in 1988, working as a part-time secretary in the Defense Finance Accounting Service ("DFAS"). Cunningham only had a high school diploma, but through a dedicated career of public service she ascended the General Schedule ("GS") ranks. In 2012, DFAS promoted Cunningham to a GS-12 supervisor position leading its benefits team. She held this position for 10 years, until her eventual promotion to a GS-13 position in 2022.

Five years into Cunningham's tenure as supervisor of the benefits team, her manager, Howard Locke, was promoted to Director of the Human Resources Shared Services Center. That left his prior GS-14 role, Benefits Division Chief, vacant. Recognizing that DFAS lacked a path for GS-12 employees to advance into the GS-14 Division Chief role, Locke sought to both hire a new Division Chief and reorganize DFAS to enable internal promotion in the future. After a desk-audit by the classification team, DFAS converted a vacant GS-12 position into a GS-13 supervisor position, which would oversee both the benefits and workers' compensation teams. Because the new GS-13 supervisor position would report to the Benefits Division Chief, Locke delayed the hiring process for the new position until the incoming Chief could participate. He did so despite a DFAS policy mandating that managers make hiring decisions within a specified timeframe.

Meanwhile, Cunningham applied for the GS-13 position. So did Emmanuel Griffin and two other DFAS employees. Griffin, a Black man, was the team leader of DFAS's customer-care call center. While Griffin lacked Cunningham's supervisory responsibilities, such as issuing performance evaluations and disciplining employees, he, too, held a GS-12 position. Griffin also had a long career in public service. Prior to joining DFAS, Griffin served in the United States Air Force for 23 years. He also worked for a private corporation, training more than 1,000 employees and handling workers' compensation matters, and for the City of Indianapolis, where he participated in human resources program design. Griffin held a Bachelor of Science degree and an MBA.

In April of 2018, DFAS hired Andrew Hartz, a White man, as the GS-14 Benefits Division Chief. In May, Hartz, along with Shante Jones, the Supervisor of Talent Management and Integration, began reviewing resumes and interviewing for the GS-13 supervisor position. They crafted four categories on which to evaluate the candidates: (1) HR and Benefits Subject Matter Expertise ("SME"), (2) Supervisory/Leadership Skills, (3) Teamwork and Process Innovation, and (4) Customer Service. They also developed six standardized interview questions to ask each candidate, four of which were behavioral.

Griffin and Cunningham emerged as the top two candidates for the position. Cunningham's subject matter expertise, in particular, garnered praise from Hartz, who regarded her as the "Best SME." But her resume and interview performance left him unconvinced of her suitability for the job. Cunningham's resume included only five years of relevant experience and listed an incorrect phone number for her supervisor, giving Hartz the impression that it was incomplete. Hartz

also felt "disappointed" in Cunningham's answers to his standardized interview questions. When asked to describe how she would approach training the growing number of benefits team members, Cunningham responded that she would train each employee herself. Hartz commented in his interview notes that her approach "doesn't scale well." Indeed, Hartz described several of Cunningham's interview answers as "tactical," rather than "strategic," meaning her responses reflected short-term thinking.

Griffin, on the other hand, earned high marks for his resume and interview. His many years of education and experience in both the public and private sectors impressed Hartz. Hartz also felt that Griffin gave "strategic" responses to the standardized interview questions and demonstrated strong leadership skills. When ranking Griffin and Cunningham across the four identified categories, Cunningham received higher marks only for her subject matter expertise, as Griffin lacked extensive experience in federal benefits. Hartz found that Griffin matched Cunningham in the leadership category and outperformed her in the process innovation and customer service categories. Hartz thus chose Griffin for the position, believing him to be the better overall candidate.

Hartz explained his hiring decision to a disappointed Cunningham in a subsequent meeting. In her deposition, Cunningham relayed her impression of Hartz's reasoning, stating:

> I felt like maybe he [Hartz] wanted something different organization-wise or structure – or for the benefits division, and, you know, maybe he felt like he could take that or do that with someone other than myself.

Cunningham also remarked that Hartz "probably thought Mr. Griffin was more suitable for the job" because she was "direct" in her communication and didn't engage in "daily chitchat" with coworkers. Firm in her belief that she was the more qualified applicant, Cunningham nevertheless departed the meeting with Hartz convinced that he preferred to work with a male and had discriminated against her based on her sex. When asked during her deposition to explain the basis for this belief, she stated that it was "heartfelt."

In August of 2018, Cunningham filed a complaint with the Equal Employment Opportunity Commission, alleging Hartz failed to promote her because of her race, sex, and age.[1] The EEOC found Cunningham had not demonstrated discrimination and informed her of her right to sue in federal court.

Upon receiving notice of her right to sue, Cunningham commenced this action. In her complaint, Cunningham renewed her allegations that DFAS had discriminated against her based on her sex (and her race, in combination with her sex), in violation of Title VII of the Civil Rights Act of 1964, when it failed to promote her into the new GS-13 supervisor position. The district court granted summary judgment in favor of DFAS, reasoning that Cunningham had not proffered evidence of sex discrimination beyond her own heartfelt belief that Hartz preferred to hire a man. This appeal followed.

---

[1] Cunningham also filed a second EEOC complaint in August of 2024, alleging DFAS discriminated against her by failing to non-competitively promote her. As Cunningham has acknowledged, she abandoned her non-competitive promotion claim before the district court. She therefore does not pursue it on appeal, and we do not reach its substance.

## II. Discussion

We review the district court's grant of summary judgment de novo. *Vassileva v. City of Chicago*, 118 F.4th 869, 873 (7th Cir. 2024). When "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate. Fed. R. Civ. P. 56(a). While we "construe all facts and draw all reasonable inferences in the nonmoving party's favor," the moving party may prevail at summary judgment "'by showing an absence of evidence to support' the nonmoving party's claims." *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020)).

Title VII "prohibits an employer from 'discriminating against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting 42 U.S.C. § 2000e-2(a)(1)); *see also Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021). To defeat a motion for summary judgment, a plaintiff must proffer evidence that "would permit a reasonable fact-finder to conclude that [the plaintiff] was subjected to an adverse employment action based on a statutorily prohibited factor." *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 788 (7th Cir. 2019); *see also Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 564 (7th Cir. 2009) (finding that a plaintiff alleging discrimination on the basis of her sex must demonstrate that the adverse employment action occurred "at least in part because she is female").

In *Ortiz v. Werner Enterprises, Inc.*, we clarified that employment discrimination plaintiffs may carry this burden through either direct or circumstantial evidence, and that "all

evidence belongs in a single pile and must be evaluated as a whole." 834 F.3d 760, 766 (7th Cir. 2016). One method for demonstrating that an employer's failure to promote a plaintiff was the product of prohibited discrimination is through the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023). Because the parties proceeded under *McDonnell Douglas*, we do too.

At *McDonnell Douglas*'s first step, the plaintiff must show that she was (1) a member of a protected class, (2) qualified for the position, (3) rejected for the position, and that (4) the position was given to a person outside the protected class who was similarly or less qualified than the plaintiff. *Logan*, 4 F.4th at 536. "If an employee meets each element of her prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Lewis*, 36 F.4th at 760. If an employer does so, the burden "shifts back to the employee to show why the employer's explanation is pretextual." *Id.*

Cunningham and DFAS agree that Cunningham has established a prima facie case of sex discrimination.[2]

---

[2] Cunningham does not argue on appeal that she has stated a prima facie case of race discrimination, acknowledging that Griffin, too, is Black. *See Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016) (holding the plaintiff could not make out a prima facie case of race discrimination where both she and the person promoted were Black).

Instead, Cunningham raises an intersectional discrimination claim, alleging that she was passed over for the promotion because of the combination of her sex and race. We do not reach the issue of whether intersectional theories of discrimination are viable under Title VII. Whether

Cunningham is a woman, she was qualified for the GS-13 position, and she did not receive it. Griffin, a man, who was either similarly or less qualified, received the promotion. At issue is whether DFAS has articulated a legitimate, nondiscriminatory rationale for selecting Griffin and whether its rationale is pretextual.

### A. Legitimate, Nondiscriminatory Hiring Rationale

An employer's genuine belief that another candidate's vision for the organization or skillset makes them better suited for the job is a legitimate, nondiscriminatory hiring rationale. *See Barnes v. Bd. of Tr. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) (hiring manager's belief that another candidate was better suited for the job because of his "thoughtful approach to taking over the position" constituted a legitimate, nondiscriminatory hiring rationale); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009) (employer's genuine belief that another candidate was better qualified was a legitimate nondiscriminatory hiring rationale).

Here, Hartz concluded from applicant resumes and interviews that Griffin's skillset and strategic vision made him best suited for the job. That Hartz relied on subjective assessments to reach this conclusion does not render DFAS's explanation illegitimate. *See Cichon v. Exelon Generation Co.*, 401 F.3d 803, 814 (7th Cir. 2005) (holding that employers "may legitimately use subjective qualifications" to choose between qualified

---

Cunningham claims that DFAS discriminated against her because she is a woman, or because she is a Black woman, she must offer evidence that DFAS decided not to promote her at least in part on account of her sex. *See Barnes-Staples v. Carnahan*, 88 F.4th 712, 719 (7th Cir. 2023). Cunningham has not carried this burden.

candidates); *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 647 (7th Cir. 2023) ("[S]uperior interview performance … can be a legitimate nondiscriminatory reason for hiring."); *Groves v. S. Bend Cmty. Sch. Corp.*, 51 F.4th 766, 771 (7th Cir. 2022) (finding that an employer's determination that the plaintiff's interview "did not go well" was subjective, yet an "entirely proper" basis for the hiring decision).

Nor does DFAS's decision to ask behavioral interview questions, rather than substantive ones, render its reliance on interview performance illegitimate. Our court is not "a super-personnel department that reexamines an entity's business decisions." *Baron v. City of Highland Park*, 195 F.3d 333, 341 (7th Cir. 1999) (citation omitted). When hiring for the GS-13 position, DFAS encountered a common HR dilemma: whether to prioritize subject matter expertise or difficult-to-measure intangibles, such as skilled customer service, familiarity with process improvement, and passion for the position evinced by thorough interview preparation. DFAS chose the intangibles, and we will not second guess its decision.

Having found that DFAS articulated a legitimate, nondiscriminatory reason for its hiring decision, we next consider whether Cunningham offered sufficient evidence to create a genuine issue of material fact as to pretext.

**B. Pretext**

An otherwise legitimate, nondiscriminatory hiring rationale is pretextual if the hiring manager did not "sincerely believe[]" the rationale when making his final decision. *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004). In other words, to be pretext, a hiring rationale must be "a lie" or "phony," *Barnes-Staples*, 88 F.4th at 716, "allowing an

inference that the [defendant's] true intent was discriminatory," *Runkel v. City of Springfield*, 51 F.4th 736, 744 (7th Cir. 2022). When an employer honestly believed it promoted the best candidate, its reasoning is not pretext, "even if its decision was inaccurate, unfair, … foolish, trivial, or baseless." *Barnes-Staples*, 88 F.4th at 716 (citation omitted); *see also Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) ("[A]n employer's decision to favor one candidate over another can be mistaken, ill-considered or foolish, [but] so long as [the employer] honestly believed those reasons, pretext has not been shown." (citation omitted)). Cunningham bears the burden of proving that Hartz's stated reason for selecting Griffin was false. *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 824–25 (7th Cir. 2006).

Cunningham's own admissions make it difficult for a reasonable factfinder to conclude that Hartz's rationale for selecting Griffin was pretextual. When asked during her deposition why she thought Hartz selected Griffin, Cunningham replied that Hartz "wanted something different organization-wise" and "maybe … felt like he could take that or do that with someone other than myself." She also acknowledged that Hartz "probably thought Mr. Griffin was more suitable for the job." In Cunningham's own telling, then, Hartz's belief that Griffin would better accomplish the organizational transformation Hartz sought was not pretext; it was true.

Even setting aside Cunningham's deposition statements, she has failed to present evidence of pretext. Cunningham clearly believes she was better qualified than Griffin, but for a disparity in qualifications to support an inference of pretext under Title VII, the plaintiff's credentials must "be so superior to the credentials of the person selected for the job that no

reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180–81 (7th Cir. 2002) (citation omitted). This is "a high evidentiary bar," *Riley*, 829 F.3d at 894, and Cunningham does not clear it. Griffin had a 23-year military career, private sector experience, and familiarity with federal benefits through his leadership of the customer care center. He impressed Hartz in his interview with his strategic approach to the benefits division's future. In short, a reasonable person could have selected Griffin for the GS-13 supervisor position; the difference between his credentials and Cunningham's does not support an inference of pretext.

Hartz's reliance on subjective assessments of the candidates' interview performances does not support an inference of pretext either. As we have previously explained, "subjective evaluations of a job candidate are often critical to the decisionmaking process." *Millbrook*, 280 F.3d at 1176 (citation omitted). So, "absent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII." *Id.* (citation omitted); *see also Groves*, 51 F.4th at 771 (finding that consideration of the plaintiff's interview performance was "entirely proper," given no evidence suggesting that the plaintiff's membership in a protected class influenced the hiring decision). Here, Cunningham presented no evidence that Hartz's subjective evaluation of her, based on her responses to standardized interview questions, masked a discriminatory intent.

Cunningham's argument that DFAS violated its own policies during the GS-13 hiring process fares no better. While "an employer's divergence from its standard hiring practices can establish, or at least be evidence of, pretext," *Barnes-Staples*, 88 F.4th at 717, DFAS's policy deviations do not evidence sex discrimination. As Cunningham herself acknowledged, DFAS delayed its hiring for the GS-13 position because it wanted the GS-14 Division Chief to select the candidate, a decision that impacted all candidates equally. *See id.* (finding no evidence of pretext where the purported policy violation "affected all candidates equally"). So did Hartz's interview questions, which, in any event, did not violate DFAS policy.

The remainder of Cunningham's pretext arguments also lack merit. Hartz's use of terms such as "tactical" and "strategic" to evaluate all applicants, male and female, reflects the broader organizational mission and lexicon of the Department of Defense, not hidden sex discrimination. That Locke did not non-competitively promote Cunningham in 2017 does not bear on whether Hartz discriminated against her in his 2018 hiring decision. And while the district court misstated the law when it dismissed Cunningham's statistical evidence out of hand, for statistics to support an employment discrimination claim, the plaintiff must *also* proffer individualized evidence of discrimination. *See id.* at 719 (holding "data alone" cannot demonstrate discrimination, but "'must be coupled with other evidence, which does most of the work.'" (quoting *Baylie v. Fed. Rsrv. Bank*, 476 F.3d 522, 524 (7th Cir. 2007))). Cunningham has not done so here.

In short, Cunningham has offered no evidence that DFAS's hiring rationale was pretextual. Armed with only her heartfelt belief that Hartz preferred to work with a man, she

cannot defeat a motion for summary judgment. *See, e.g., Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (observing that a plaintiff cannot "thwart summary judgment by speculating as to the defendant/employer's state of mind").

\*          \*          \*

The judgment of the district court is

AFFIRMED.